MCKEIG, Justice.
*623 In 2013, police responded to a 911 emergency call from a distraught woman who sought help because a man with a gun was in her apartment and she was afraid for the safety of herself and her infant child. When the police arrived, they found the man, later identified as Justin Stephen Ries, asleep on a couch. Police checked Ries for firearms by patting him down while he was asleep, found the handgun, and removed it. Ries, a felon, was not eligible to possess a firearm and was tried and convicted of that crime. See Minn. Stat. § 609.165, subd. 1b(a) (2018).
On postconviction review, Ries argued that police unreasonably searched and seized him, violating his Fourth Amendment rights. Ries also argued that, because a juror was actually biased, the district court erred when it denied his motion to remove that juror. The postconviction court rejected his Fourth Amendment argument, concluding that the officers were performing a "community caretaking function" when they checked Ries for firearms, and removed and secured the gun. The postconviction court, however, agreed that Ries was entitled to a new trial because a juror was actually biased and was not sufficiently rehabilitated. The court of appeals affirmed on both issues, but the court of appeals concluded the pat-frisk of Ries was reasonable under the exception to the warrant requirement recognized in Terry v. Ohio , 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), as opposed to the postconviction court's "community caretaking function" rationale. Ries v. State , 889 N.W.2d 308, 318 (Minn. App. 2016).
The State petitioned for further review on the juror issue. Ries petitioned for conditional cross-review on the Fourth Amendment issue. We agree that Ries is entitled to a new trial because of the presence of an actually biased juror and affirm the court of appeals on that issue. We also hold that the pat-frisk of Ries was valid under the emergency-aid exception to the Fourth Amendment warrant requirement. We therefore affirm the court of appeals, although on different grounds.
FACTS
In the early morning hours of January 5, 2013, officers responded to a call for help at an apartment in Saint Paul. Jeffrey Korus, one of the officers on the scene, testified that a "weapons call" was received from a woman, S.A., who told the 911 operator that there was a man in her apartment whom she did not know and that he was in possession of a handgun. S.A. wanted the man removed from her apartment, and she said she was afraid for the safety of her six-month-old child, who was also in the apartment. Officer Korus testified that he found S.A. outside the apartment building and extremely frantic. Officer Korus also testified that S.A. was crying, shaken, and, at first, had difficulty talking. S.A. again reported, this time to Officer Korus, that she did not know the men inside her apartment, the men had been drinking, and she was afraid of one of the men, reportedly in possession of a handgun. She told Officer Korus that she was afraid for her child.
Officer Korus asked S.A. for details about the layout of the apartment, and where in the apartment the child and the man with the gun were located. Two other officers arrived, and after S.A. consented to entry into the apartment by the officers, they entered with their guns drawn.
The officers discovered Ries in the living room, passed out on a couch. Two other men were also asleep in the room, one on the floor and another on a different couch. The child was asleep in the next room.
*624 After performing a brief sweep to secure the apartment, the next objective of the officers was to secure the handgun. Officer Korus testified that he was concerned that if they woke Ries without first securing the handgun, he might "act erratically," and that was "a risk [they] didn't want to take." The officers "wanted to remove the threat" before waking Ries.
While another officer held Ries's hands, Officer Korus performed a pat-frisk of Ries to locate the gun. After the officers turned Ries over, Officer Korus saw the wooden handle of the gun sticking out of Ries's waistband. Officer Korus removed the gun and temporarily placed it in a different room. Ries did not wake up while the police patted him down looking for the gun, and at no point, before waking Ries, did any of the responding officers suspect criminal activity or intend to arrest anyone in the apartment.
Once the officers woke Ries, they identified him and ran a criminal history check. The result showed that he was ineligible to possess a firearm based on a prior felony conviction for a "crime of violence" as defined by Minn. Stat. § 624.712, subd. 5 (2018). The officers later learned that Ries was a friend of S.A.'s brother, who was also a tenant of the apartment and present at the time of the pat-frisk.
Ries was charged with possession of a firearm by an ineligible person. See Minn. Stat. § 609.165, subd. 1b(a). Before trial, Ries moved to suppress the handgun, arguing that one officer "seized" him (by holding his hands) and another officer "searched" him (by performing the pat-frisk). Ries argued that the seizure and search of his person was unreasonable under Terry v. Ohio , 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), because the officers lacked the requisite reasonable articulable suspicion of criminal activity. The State responded that the limited seizure and search were reasonable under the "emergency exception" to the warrant requirement.
After an omnibus hearing, the district court denied the suppression motion. The district court found that responding officers entered S.A.'s apartment "motivated by the need to render assistance" to S.A. and her infant child. The district court determined that the officers performed this search under the reasonable belief that if they did not secure the weapon before waking Ries, he might wake up, "be quite startled, and possibly reach for the handgun[,] creating a very dangerous situation" that would threaten the safety of the officers, S.A., and her infant child. Accordingly, the district court held that the brief seizure and search of Ries was objectively reasonable under the emergency-aid exception to the warrant requirement,[1] and in the alternative, was a permissible Terry pat-frisk.
At trial, during voir dire, a prospective juror, Juror 18, disclosed that she was employed as a 911 operator. When asked by the district court whether it was possible that Juror 18 would give more or less weight to a police officer's testimony, Juror 18 responded "[p]robably, yes" because she is "their backup." When Juror 18 was asked if it would be hard for her to separate her experience as a 911 operator and simply listen to the evidence as it is presented, she responded "[y]eah." When asked whether she could listen to the facts and make a determination of guilt based *625 on what she heard, Juror 18 answered "yes, I think."
Ries moved to strike Juror 18 for cause. The district court again asked Juror 18 whether she would give the testimony of police officers more credibility or weight because they were police officers. Juror 18 responded:
I think I would. Just as a 911 operator, I would believe that they were giving the facts the way that they understand them, and I think that I would have a better understanding of where they were coming from as peace officers having been their partner essentially off the street. So whether or not I would think that it was more credible than the suspect's-also his version, no.
Juror 18 then said, "I think if we were at the point where they were both severely conflicted with each other, then I think I would side with the police officer ... because I would believe that he wasn't lying, and I might believe that the suspect was." In an attempt to rehabilitate Juror 18, the following exchange occurred:
THE COURT: But what would you base that on, on the fact that he was a peace officer, or on the fact that he doesn't have a dog in this fight?
[JUROR 18]: Ah, I don't know, because I've known some peace officers that I probably wouldn't believe, so I-that's a hard question, and I guess without knowing the facts, you know, I-I would honestly try to look at both sides. But I do know from experience that they conflict a lot.
THE COURT: Sure.
[JUROR 18]: So I certainly would do my best to be fair.
....
THE COURT: And so let me just see if I can recap this. What you just said was that if the peace officer said something, but you're getting a story from somebody else who is not in law enforcement-okay, that-I guess what I want to know is, what is it that causes you to believe the peace officer over someone else? Is it simply because they are a peace officer, or are you going to base it on how you would judge anybody else that's-that you've met for the first time and you're trying to figure out whether they're tell[ing] you the truth?
[JUROR 18]: Right. I guess probably what you said is that they-the defendant in this instance has more at stake I guess would be probably to, you know-they do have more at stake in this instance, so I would hope the peace officer was being objective. But not hearing the case, it's hard to say.
When asked again whether she would base her decision solely on the fact that it was a police officer testifying, Juror 18 answered, "No."
The district court denied Ries's motion to strike Juror 18 for cause, finding that the juror showed actual bias but that she was sufficiently rehabilitated. Ries did not use one of his available peremptory challenges to remove Juror 18, and Juror 18 subsequently sat on the jury during the trial. The jury found Ries guilty and the district court sentenced him to 48 months in prison. Ries did not file a direct appeal.
In 2015, Ries filed a postconviction petition, arguing structural error in the district court's denial of his for-cause strike of Juror 18 and reversible error in the district court's denial of his motion to suppress.[2] The State disagreed, arguing that the pat-frisk of Ries was necessary for officer safety and valid pursuant to Terry . The State also argued that Ries's failure to *626 use one of his five remaining peremptory challenges to remove Juror 18 was invited error and, as a result, he was not entitled to a new trial. The postconviction court determined that the district court committed reversible error by denying the motion to strike Juror 18 for cause. The postconviction court found that Juror 18 had not been sufficiently rehabilitated because the juror did not "unequivocally state that she would put aside[ ] her perceived notions about the credibility of ... certain witnesses with evaluating testimony." Although the State argued that Ries was not entitled to relief because he did not use a peremptory strike to remove Juror 18, the postconviction court did not rule on whether Ries forfeited his right to challenge the district court's for-cause ruling. Because the postconviction court concluded that a biased juror sat on the jury, it reversed the conviction and ordered a new trial.
But the postconviction court did not agree that the district court erred in declining to suppress the gun. From the bench, the postconviction court said:
Here the officers were conducting an investigation of an unconscious drunk man with a gun in someone else's house and attempting to ascertain whether this man was intoxicated with a loaded weapon, thereby presenting a community concern and the concern to the occupant of the apartment and her child.
This is not in question. The [United States] Supreme Court has recognized that police officers frequently investigate circumstances [in] which there is no claim of criminal liability and engage in what-for what may be, for want of a better term , may be described as [a] community caretaking function totally divorced from the detection, investigation or acquisition of evidence relating to violation of a criminal statute.
[Ries] challenges the reasonableness of the officer's actions under the circumstances. This Court does not.... The constitution does not require law enforcement to sit and wait for [a person] to awaken or to obtain a warrant to temporarily hold a gun while they briefly investigat[e].
(Emphasis added).
Both parties appealed-the State on the juror issue, and Ries on the Fourth Amendment issue. Ries again framed his Fourth Amendment argument around Terry , arguing that the seizure and search of his person was unreasonable because the officers lacked reasonable articulable suspicion that he had committed a crime. The State, in turn, argued that the "minimal detention" of Ries and the " Terry pat for safety" were justified by the " 'public servant' component" of a "community-caretaking function" recognized by courts, allowing police to "act without a warrant to protect public safety, totally divorced from the detection of or investigation of crime."
The court of appeals characterized the State as having argued "for the first time, that the search [of Ries] was a valid Terry protective frisk." Ries v. State , 889 N.W.2d 308, 316 (Minn. App. 2016). The court did not examine either the emergency-aid exception or the community-caretaking exception, although it acknowledged that both doctrines had been previously invoked. See id. Instead, the court analyzed the Fourth Amendment issue entirely under Terry . Id. at 316-17. The court observed that Terry applies "not just to crime apprehension," but "more broadly to crime prevention." Id. at 317. Thus, "if an officer reasonably suspects a person is about to commit a crime, a protective pat search is warranted in the interests of officer and community safety." Id. Because "the officers had reasonable suspicion that a startled Ries might commit a crime," the *627 court held that the pat-frisk of Ries was justified under Terry . Id.
As to the juror issue, the court of appeals agreed with the postconviction court's analysis and concluded that Ries did not forfeit his right to challenge the district court's denial of his for-cause challenge to Juror 18 when he chose not to use a peremptory challenge. Id. at 313-15.
The State petitioned for review on the issue of whether Ries forfeited his right to challenge the for-cause ruling by not using a peremptory challenge to remove Juror 18. Ries petitioned for conditional cross-review of whether the search and seizure was a valid Terry pat-frisk. We granted both petitions.
ANALYSIS
"The decisions of a postconviction court will not be disturbed unless the court abused its discretion." Dukes v. State , 621 N.W.2d 246, 251 (Minn. 2001) (citation omitted). A postconviction court abuses its discretion when it has "exercised its discretion in an arbitrary or capricious manner, based its ruling on an erroneous view of the law, or made clearly erroneous factual findings." Rhodes v. State , 875 N.W.2d 779, 786 (Minn. 2016) (quoting Brown v. State , 863 N.W.2d 781, 786 (Minn. 2015) ). We review legal issues de novo, and our review of factual issues "is limited to whether there is sufficient evidence in the record to sustain the postconviction court's findings." Matakis v. State , 862 N.W.2d 33, 36 (Minn. 2015) (quoting Vance v. State , 752 N.W.2d 509, 512 (Minn. 2008) ).
I.
We first address the Fourth Amendment issue. Concerning this question, the facts are undisputed. Whether Ries was searched, and if so, whether a recognized exception to the Fourth Amendment applies, are both questions of law that we review de novo.[3] State v. Zornes , 831 N.W.2d 609, 621 (Minn. 2013).
The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Searches conducted without a warrant are "presumptively unreasonable." State v. Stavish , 868 N.W.2d 670, 675 (Minn. 2015). However, because "the ultimate touchstone of the Fourth Amendment is reasonableness," that presumption may be overcome if a recognized exception to the warrant requirement applies. Id. (quoting Brigham City v. Stuart , 547 U.S. 398, 403, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006) ).
Ries argues that the police unlawfully searched him in violation of his Fourth Amendment rights. Specifically, Ries argues that the court of appeals erred when it held that the pat-frisk of his person by police was a valid Terry frisk for officer safety. See Ries , 889 N.W.2d at 317. Ries also argues that the exceptions to the Fourth Amendment's warrant requirement that the district court and the postconviction *628 court relied on-the emergency-aid exception and the community-caretaking exception, respectively-are inapplicable. The State agrees that Terry is not useful precedent here. It argues instead that the pat-frisk was justified under what it calls the "community-caretaking exception" to the warrant requirement.
We must first determine whether police searched Ries in violation of his Fourth Amendment rights. It is indisputable that a pat-frisk of a person's body for the purpose of discovering weapons is a Fourth Amendment search. See State v. Harris , 590 N.W.2d 90, 104 (Minn. 1999) (citing Terry , 392 U.S. at 30, 88 S.Ct. 1868 ). We therefore agree that Ries was searched, and that a recognized exception to the warrant requirement must apply for the search to be valid.
Next, we consider whether a recognized exception to the warrant requirement applies. The court of appeals held that the pat-frisk of Ries was valid under Terry because the Terry pat-frisk exception applies when an officer has reasonable suspicion that a person "might" commit a crime. See Ries , 889 N.W.2d at 317 ("In sum, the officers had reasonable suspicion that a startled Ries might commit a crime, and were warranted in the belief that their safety and the safety of others could be in danger." (emphasis added) ). In Terry , the stop-and-frisk of a person on a sidewalk was justified because the police officer "had observed circumstances that would reasonably lead an experienced, prudent policeman to suspect that Terry was about to engage in burglary or robbery." 392 U.S. at 33, 88 S.Ct. 1868 (Harlan, J., concurring) (emphasis added). Terry does not stand for the proposition that the pat-frisk exception applies to any person who "might" commit a crime. Moreover, the record here demonstrates that officers patted Ries down without any suspicion of criminal activity and without any intent to make an arrest. The court of appeals therefore erred in determining that the search of Ries was justified by Terry .
The other two exceptions implicated throughout this case are the "emergency-aid" exception and the so-called "community caretaker" exception.[4] There is a significant degree of confusion in the law surrounding the "community-caretaker"
*629 exception and its relationship to the "emergency-aid" exception. See Sutterfield v. City of Milwaukee , 751 F.3d 542, 553 & n.5 (7th Cir. 2014) (discussing these doctrines and the lack of clarity in their "articulation and application" and citing scholarship on the issue). Sharing a number of characteristics, these doctrines often overlap and, as here, a single set of facts may involve both. See id. at 553. Thus, before reaching the State's arguments and analyzing which, if any, exception to the warrant requirement applies, we must review the relevant doctrines.
A.
The United States Supreme Court first applied what we call the "community-caretaker" exception in the context of a warrantless search of an automobile. See Cady v. Dombrowski , 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973). Officers had the vehicle towed after the driver, who was intoxicated, crashed it, and subsequently passed out. Id. at 435-36, 93 S.Ct. 2523. Believing that the driver was a police officer who was required to carry his service revolver at all times, law enforcement searched the vehicle before and after it was towed to recover his gun. Id. at 436-37, 93 S.Ct. 2523. The second time the vehicle was searched, an officer found multiple items covered in blood. Id. at 437, 93 S.Ct. 2523. The driver was later convicted of first-degree murder, see State v. Dombrowski , 44 Wis.2d 486, 171 N.W.2d 349, 353 (1969), and on appeal to the Supreme Court he argued that the warrantless search of his vehicle was unreasonable. Cady , 413 U.S. at 442, 93 S.Ct. 2523.
The Court held that the search of the vehicle was reasonable. "[T]wo factual considerations deserve emphasis," the Court said: (1) "the police had exercised a form of custody or control" over the vehicle, having removed it from the highway because it "constituted a nuisance," and (2) searching the vehicle for an unsecured weapon was consistent with " 'standard procedure in [that police] department,' to protect the public from the possibility that a revolver would fall into untrained or perhaps malicious hands." Id. at 442-43, 93 S.Ct. 2523. The Court described these actions "as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." Id. at 441, 93 S.Ct. 2523. Because "[t]he ultimate standard set forth in the Fourth Amendment is reasonableness," the search was justified. Id. at 439, 93 S.Ct. 2523.
The decision in Cady evolved into a warrant exception that applies in the context of routine administrative searches of vehicles that have been taken into police custody. See South Dakota v. Opperman , 428 U.S. 364, 368-72, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976) (discussing Cady and the relationship of "community caretaking functions" to searches of vehicles). We call these "inventory searches." See State v. Gauster , 752 N.W.2d 496, 502 (Minn. 2008) (discussing Opperman ). The Supreme Court has never applied a "community-caretaker" exception outside of a vehicle search.
Nevertheless, some cases from federal circuits and state courts have applied Cady in a broader context. See, e.g. , United States v. Quezada , 448 F.3d 1005, 1007-08 (8th Cir. 2006) (applying Cady in the context of warrantless entry into a home); United States v. Rohrig , 98 F.3d 1506, 1521 (6th Cir. 1996) (applying Cady where officers "enter[ed] Defendant's residence for the limited purpose of locating and abating a nuisance ... [seeking] to restore the neighbors' peaceful enjoyment of their homes and neighborhood"); People v. Ray , 21 Cal.4th 464, 88 Cal.Rptr.2d 1, 981 P.2d 928, 938 (1999) (holding that an entry into *630 a home for "a security check" was justified under the community-caretaker exception); People v. Slaughter , 489 Mich. 302, 803 N.W.2d 171, 180 (2011) (concluding that the community-caretaker exception applies to firefighters responding to an emergency in a home). These cases involve a wide array of "community-caretaking functions" that are consistent with "everyday police activities undertaken to aid those in danger of physical harm, to preserve property, or to create and maintain a feeling of security in the community." Debra Livingston, Police, Community Caretaking, and the Fourth Amendment , 1998 U. Chi. Legal F. 261, 272 (1998) (footnote omitted) (internal quotation marks omitted).
Like the vehicle searches in Cady and Opperman , police officers undertake these activities separate and apart from a law enforcement role-that is, "divorced from the detection, investigation, or acquisition of evidence relating to" crime. Cady , 413 U.S. at 441, 93 S.Ct. 2523. But unlike in Cady and Opperman , these activities are not motivated by concerns specific to automobiles taken into custody by police. See State v. Ryon , 137 N.M. 174, 108 P.3d 1032, 1042-43 (2005) (discussing the different standards applicable to the "distinct doctrines under the community caretaker exception").
These non-vehicle search cases often conflate police "community-caretaking functions" with police actions that are justified under the distinct, but related, "emergency-aid" exception to the warrant requirement. See , e.g. , United States v. Stafford , 416 F.3d 1068, 1073 (9th Cir. 2005) (citing Cady but applying the "emergency doctrine"); State v. Deneui , 775 N.W.2d 221, 237 (S.D. 2009) (discussing "courts [that] apply[ ] the community caretaker exception but us[e] a test applicable to the emergency doctrine or the emergency aid doctrine").
The Supreme Court recognized the emergency-aid exception in Brigham City v. Stuart , 547 U.S. 398, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006). Brigham City involved officers who responded to a complaint about a loud house party. Id. at 400-01, 126 S.Ct. 1943. The officers approached the house after hearing shouting. Id. at 401, 126 S.Ct. 1943. As they proceeded down the driveway, "they observed two juveniles drinking beer." Id. Entering the backyard, the officers looked through a screen door of the house and observed a fight. Id. One person punched another in the face, causing the victim to spit blood. Id. Many other people inside the home tried to restrain the assailant before and after the blow. Id. One officer entered the house through the screen door, "cried out, and as the occupants slowly became aware that police were on the scene, the altercation ceased." Id. There were multiple arrests and charges arising out of these circumstances. Id.
The Supreme Court held that the officer's warrantless entry into the home was reasonable. Id. at 406, 126 S.Ct. 1943. "The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency," the Court said. Id. at 403, 126 S.Ct. 1943 (quoting Mincey v. Arizona , 437 U.S. 385, 392, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978) ). "Accordingly, law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." Id.
The Court rejected two arguments as to why the search was unreasonable. Id. at 404, 126 S.Ct. 1943. The first argument was that the officer was subjectively "more interested in making arrests" than in assisting persons inside the house and preventing further violence. Id. Consistent *631 with established Fourth Amendment case law, the Court affirmed that "[t]he officer's subjective motivation is irrelevant." Id. The officers were objectively motivated by the need to render aid, and that was sufficient to justify the warrantless entry. See id. at 406-07, 126 S.Ct. 1943.
The second argument advanced against the officer's entry was that the circumstances were "not serious enough to justify the officers' intrusion into the home." Id. at 405, 126 S.Ct. 1943. The Court disagreed:
In these circumstances, the officers had an objectively reasonable basis for believing both that the injured adult might need help and that the violence in the kitchen was just beginning. Nothing in the Fourth Amendment required them to wait until another blow rendered someone "unconscious" or "semi-conscious" or worse before entering. The role of a peace officer includes preventing violence and restoring order, not simply rendering first aid to casualties; an officer is not like a boxing (or hockey) referee, poised to stop a bout only if it becomes too one-sided.
Id. at 406, 126 S.Ct. 1943.
Unlike the community-caretaker exception, which is a stand-alone exception to the warrant requirement insofar as it applies to vehicles, the emergency-aid exception is a subset of the exigent-circumstances exception to the warrant requirement, as set out in Brigham City . See id. at 403, 126 S.Ct. 1943 ("One exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury."). Traditionally, we have applied the exigent-circumstances exception in situations where police have "reason to believe a crime ha[s] been committed," State v. Othoudt , 482 N.W.2d 218, 223 (Minn. 1992), coupled with an "urgent need" to conduct a search or seizure, State v. Olson , 436 N.W.2d 92, 97 (Minn. 1989). Examples of exigencies in the context of a criminal investigation or law enforcement action include "hot pursuit of a fleeing felon" and "imminent destruction of evidence." Olson , 436 N.W.2d at 97.
But, consistent with Brigham City , we also recognize exigencies in circumstances when police are objectively motivated by the need to render aid or prevent injury. See State v. Lemieux , 726 N.W.2d 783, 787-88 (Minn. 2007). In Lemieux , we considered whether warrantless entry into a home was justified under the exigent circumstances/emergency-aid exception. Id. at 787-90. The facts of that case concerned officers who were investigating a murder that had occurred earlier that morning. Id. at 784-85. The officers went into a home to contact the tenant and anyone else who might be residing there. Id. at 785. When they arrived, "they saw that the screen on the window to the right side of the door had been torn loose, the window had been pushed up, and the door was slightly open, not latched." Id. (internal quotation marks omitted). They could hear music playing inside, sounding like a skipping compact disc. Id. Concerned that a burglary had occurred and that there might be injured persons inside the home, the officers banged loudly on the door and shouted the name of the tenant. Id. When they received no answer, the officers entered the home and performed a "quick sweep of the floors." Id. While inside, the officers observed the murder victim's electronic benefit transfer (EBT) card in plain view. Id. at 786. The officers subsequently secured a search warrant for the home. Id. During the execution of the search warrant, they discovered more items belonging to the victim, as well as items implicating Lemieux as the assailant. Id.
*632 Lemieux challenged the "warrantless sweep-search" of the home.[5] Id. at 787. We said that "law enforcement officers, in pursuing a community-caretaking function, 'may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury.' " Id. at 787-88 (quoting Brigham City , 547 U.S. at 403, 126 S.Ct. 1943 ). We applied a two-prong test to determine whether the search was reasonable under the "emergency-aid exception":
[First, t]he police must have reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property ... [and second, t]here must be some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched.
Id. at 788.[6] We also emphasized that a "warrantless search must be 'strictly circumscribed by the exigencies which justify its initiation.' " Id. (quoting Mincey , 437 U.S. at 393, 98 S.Ct. 2408 ). That is, a warrantless search must be "limited by the type of emergency involved. It cannot be used as the occasion for a general voyage of discovery unrelated to the purpose of the entry." Id. (quoting United States v. Moss , 963 F.2d 673, 678 (4th Cir. 1992) ). Ultimately, we held that the search of the home was justified under the emergency-aid exception to the warrant requirement. Id. at 790.
Doctrinally, the community-caretaker exception and the emergency-aid exception are distinct. Under the community-caretaker exception, a search is reasonable if officers are performing routine procedures that are "totally divorced" from their criminal investigation and law enforcement roles. Cady , 413 U.S. at 441, 93 S.Ct. 2523. Under the emergency-aid exception, officers may help an injured person or act to protect life or property if they "have reasonable grounds to believe that there is an emergency at hand" and they have some "reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched." Lemieux , 726 N.W.2d at 788. Under the emergency-aid exception, it does not matter if officers have reason to believe some criminal activity is afoot as long as they are objectively motivated by the need to give aid. See Brigham City , 547 U.S. at 404, 126 S.Ct. 1943. Further, the Supreme Court has only recognized the community-caretaker doctrine as a formal exception to the warrant requirement in the context of inventory searches of vehicles. See Opperman , 428 U.S. at 375-76, 96 S.Ct. 3092. Thus, we are careful here to distinguish between community-caretaking functions and police actions performed while providing emergency aid. These doctrines are distinct and should not be confused.[7]
*633 B.
We now turn to the facts and arguments of this case, beginning with our analysis of the State's community-caretaker argument. The State argues that the search of Ries was "a reasonable exercise of the police caretaking function to ensure safety," and that "there is ... a recognized 'public servant' component to the caretaking function."
The Supreme Court has never applied the community-caretaker exception outside of the automobile context, and we decline to do so here. The officers searched Ries without any suspicion of criminal activity, and the record is not adequately developed on the issue of whether police officers routinely engage in the conduct at issue here as part of a caretaking function. We therefore reject the State's community-caretaker argument.
We conclude, however, that the search of Ries by the officers was objectively reasonable under the emergency-aid exception. The record shows that the officers who responded to S.A.'s call for help were objectively motivated by the need to assist her and to prevent serious injury due to the presence of an unsecured handgun. Under the reasonable belief that Ries could wake up at any moment, become startled, and reach for the gun, the officers made an effort to secure the gun before waking Ries. The officers took these actions to protect themselves, S.A., and the others in the apartment, including S.A.'s child.
The totality of these facts-S.A.'s demeanor and call for help, the fact that Ries was intoxicated, and the presence of a handgun on a sleeping person whom officers reasonably believed could wake up and create an immediately life-threatening situation-lead us to conclude that the emergency-aid exception applies here. The officers had reasonable grounds to believe that they were faced with an emergency and that there was an immediate need for their assistance for the protection of life. See Mincey , 437 U.S. at 392, 98 S.Ct. 2408 ("[T]he Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid."); Lemieux , 726 N.W.2d at 788. An unsecured firearm in the possession of an intoxicated person poses a grave and immediate threat, especially in the presence of children. Cf. United States v. Antwine , 873 F.2d 1144, 1147 (8th Cir. 1989) (upholding the reasonableness of the warrantless search for and seizure of an unsecured firearm that was motivated by a "legitimate concern for the safety of individuals," including children).
Furthermore, the officers had a reasonable basis, approximating probable cause, to associate the emergency with the object of the search-Ries. See id. That the object of the search was Ries and not a home makes no doctrinal difference. See Brigham City , 547 U.S. at 403, 126 S.Ct. 1943 ("[W]arrants are generally required to search a person's home or his person unless the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." (internal quotation marks omitted) (emphasis added) ). Here, the exigency was, to use the language of Brigham City, on the person of Ries. Officers had no other way to address the exigency of the situation without risking serious harm to themselves, S.A., or the child. Viewed in this light, it is arguable that "the officers would have been derelict in their duty if they had acted otherwise." Deneui , 775 N.W.2d at 239 ; see also Lemieux , 726 N.W.2d at 788 n.2 (quoting 3 Wayne R. LaFave, Search and Seizure § 6.6(a) (4th ed. 2004), for the same "derelict in their *634 duty" standard for emergency-aid searches). Thus, these actions were "strictly circumscribed" to address the specific exigency that the officers faced. See Lemieux , 726 N.W.2d at 788 (quoting Mincey , 437 U.S. at 393, 98 S.Ct. 2408 ).
Consistent with the Court's remarks in Brigham City , the officers here were not required to wait until the situation became catastrophic before they were allowed to act in a protective capacity. See 547 U.S. at 406, 126 S.Ct. 1943. The officers were asked to remove an armed, intoxicated man. If, as the officers objectively and reasonably believed he might, Ries had woken up, become startled, and brandished the gun, the situation would have become immediately and irreversibly life-threatening for the officers, S.A., and her infant child. These officers acted consistently with their role as "peace officer[s] [which] includes preventing violence ... not simply rendering first aid to casualties...." Id. at 406, 126 S.Ct. 1943 (emphasis added). Accordingly, the search of Ries by Officer Korus was reasonable under the emergency-aid doctrine.
II.
We next address the juror-bias issue. Whether Ries forfeited his right to challenge the district court's for-cause ruling by not using an available preemptory challenge to remove a juror is governed Minn. R. Crim. P. 26.02. We construe and interpret our rules of criminal procedure de novo. State v. Underdahl , 767 N.W.2d 677, 681 (Minn. 2009). The State does not dispute that Juror 18 was biased and that structural error occurred. Instead, the State argues that the court of appeals erred when it held that Ries did not forfeit his right to challenge the for-cause ruling. We disagree.
For-cause challenges and peremptory challenges are distinct concepts. A party may only strike a juror for cause in certain circumstances. See Minn. R. Crim. P. 26.02, subd. 5(1) (listing 11 grounds for which a juror may be challenged for cause). On the other hand, peremptory challenges may be exercised for any reason, such as "sudden impressions, gestures, or a mere feeling," State v. Bowers , 482 N.W.2d 774, 776 (Minn. 1992) (citation omitted) (internal quotation marks omitted), as long as its purpose is not discriminatory, see State v. Pendleton , 725 N.W.2d 717, 726-27 (Minn. 2007).
The United States Supreme Court has long held that peremptory challenges are not grounded in the Constitution. See Stilson v. United States , 250 U.S. 583, 586, 40 S.Ct. 28, 63 L.Ed. 1154 (1919). Rather, they are the means to achieve a constitutional end: the right to an impartial jury. See Ross v. Oklahoma , 487 U.S. 81, 88, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988). Thus, "peremptory challenges are a creature of statute" and a state may "define their purpose and the manner of their exercise." Id. at 89, 108 S.Ct. 2273.
Minnesota Rule of Criminal Procedure 26.02 addresses both peremptory challenges and for-cause challenges. The rule lists the grounds for which a party can make a for-cause challenge, how and when a for-cause challenge can be exercised, and requires the court to "determine the challenge." Minn. R. Crim. P. 26.02, subd. 5. It also provides for the number of peremptory challenges that each party is entitled to and the rules governing objections to peremptory challenges. Id. , subds. 6-7. But, as the State concedes, nothing in the plain language of Rule 26.02 provides that a party forfeits the right to challenge the district court's for-cause ruling by not using an available peremptory challenge to remove the juror. Because the plain text of Minn. R. Crim. P. 26.02 unambiguously contains no forfeiture rule, we decline to *635 read such a requirement into it. See State v. Thomas , 891 N.W.2d 612, 616 (Minn. 2017) ("[W]e are not permitted to add words or phrases to the text of an unambiguous rule." (citation omitted) ).
Our conclusion is supported by the Supreme Court's decision in United States v. Martinez-Salazar , 528 U.S. 304, 120 S.Ct. 774, 145 L.Ed.2d 792 (2000). In that case, the defendant used a peremptory challenge to remove a juror after the district court denied his for-cause motion. Id. at 309, 120 S.Ct. 774. The defendant subsequently used all of his remaining peremptory challenges allotted under the Federal Rules of Criminal Procedure. Id. On appeal, the defendant argued that the district court erred in refusing to strike the juror for cause and that this error "forced" the defendant to use a peremptory challenge. Id. The government made the same argument that the State makes here, asserting that the federal rule "should be read to require a defendant to use a peremptory challenge to strike a juror who should have been removed for cause, in order to preserve the claim that the for-cause ruling impaired the defendant's right to a fair trial." Id. at 314, 120 S.Ct. 774 (emphasis added).
The Court explicitly rejected this argument, stating that none of the "procedures under which peremptory challenges are exercised ... demand[ ] that a defendant use or refrain from using a peremptory challenge on a particular basis or when a particular set of facts is present." Id. The Court went on to agree with the Government's narrower contention that the federal rule was not violated because it gave the defendant the choice "to stand on his objection to the erroneous denial of the challenge for cause or to use a peremptory challenge to effect an instantaneous cure of the error."[8] Id. at 316, 120 S.Ct. 774 (emphasis added).
To be sure, if we wanted to create such a forfeiture rule, we could have done so in the text of the Minn. R. Crim. P. 26.02. See Ross, 487 U.S. at 90-91, 108 S.Ct. 2273 (holding that a defendant was not deprived of his right to an impartial jury where state law required him to use a peremptory challenge to preserve a claim that a court's for-cause ruling deprived him of a fair trial). But we have not adopted such a rule for good reason. Under Minnesota law, the State's proposed rule is circular. If a party were required to use a peremptory challenge to preserve the right to appeal a for-cause ruling, there would be no basis to challenge the for-cause ruling at all-the party would have already ensured the right to an impartial jury by using a peremptory challenge to remove the juror. See State v. Nissalke , 801 N.W.2d 82, 108 (Minn. 2011) (holding that a defendant is not entitled to a new trial when a peremptory challenge is used to cure a district court's erroneous denial of a motion to remove a biased juror for cause); State v. Barlow , 541 N.W.2d 309, 312 (Minn. 1995) ("Even if the declination to dismiss the one juror for cause was erroneous, the error was cured by exercise of the peremptory challenge . The peremptory served the purpose *636 for which it is intended and the potential juror did not serve on defendant's jury." (emphasis added) ); State v. Lawlor , 28 Minn. 216, 9 N.W. 698, 699 (1881) (holding that the defendant was not prejudiced by using one of his peremptory challenges after the district court denied his challenge for cause because the juror did not sit on the jury). Indeed, an error only occurs if the biased juror actually sits on the jury. See State v. Fraga , 864 N.W.2d 615, 623 (Minn. 2015) ("Permitting a biased juror to serve is structural error requiring automatic reversal.").
In sum, the court of appeals correctly held that Ries did not forfeit his right to challenge the for-cause ruling by choosing not to use a peremptory challenge to remove Juror 18. Because the State concedes that structural error occurred, we affirm the court of appeals' decision to reverse Ries's conviction and remand to the district court for further proceedings consistent with this opinion. See id. at 626.
CONCLUSION
For the foregoing reasons, we affirm the decision of the court of appeals.
THISSEN, J., not having been a member of this court at the time of submission, took no part in the consideration or decision of this case.
Concurring/Dissenting, Lillehaug, J.
Concurring/Dissenting, Hudson, J.
CONCURRENCE & DISSENT
LILLEHAUG, Justice (concurring in part, dissenting in part).
I agree with the opinion of the court on the juror and Terry issues, the two issues on which we granted review. I respectfully disagree with the court's decision to reach the issue of whether the emergency-aid exception justified a warrantless search. We did not grant review on that issue, and the State did not brief it. The State put all of its eggs in one basket: the community-caretaking exception, which the State emphasized was "distinct" from the emergency-aid exception.
Therefore, the issue on which the court bases its decision today is not properly before us. See, e.g., State v. Williams , 771 N.W.2d 514, 517 n.2 (Minn. 2009) (noting that a party forfeits appellate review by failing to brief or argue an issue). I agree with Justice Hudson that, if the issue is yet alive, it should be considered by the court of appeals on remand.
CONCURRENCE & DISSENT
HUDSON, Justice (concurring in part, dissenting in part).
I agree that a party does not forfeit the right to challenge a district court's ruling on a motion to strike a juror for cause by not using a preemptory challenge to remove a juror. I also agree that the court of appeals erred when it held that the exception to the warrant requirement announced in Terry v. Ohio , 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), applies when an officer has a reasonable suspicion that a person "might" commit a crime. Having answered the two questions on which we granted review, I would say no more but instead would remand to the court of appeals for further consideration of the undecided issues. Because our precedent does not support the majority's affirmance of the court of appeals' decision based on a legal doctrine the State abandoned in its briefs to this court, I respectfully dissent.
I.
The facts relating to the route by which Ries's Fourth Amendment issue arrived at *637 our court bear repeating. On January 5, 2013, a 911 caller reported that she feared for the safety of her young child because she saw the butt of a handgun in the waistband of an intoxicated man, who was present in her apartment. The police entered the apartment with the 911 caller's consent. As the officers entered the living room, they observed a man, later identified as Justin Stephen Ries, lying face down on a couch. Ries appeared to be asleep or passed out. At that moment, the officers did not suspect that Ries was engaged in any criminal conduct. However, pursuant to the 911 caller's request, the officers planned to wake Ries and ask him to leave the apartment. Based on the information provided by the 911 caller, the officers reasonably believed Ries possessed a handgun. Concerned that Ries might reflexively reach for the gun when the officers tried to wake him, they grabbed his hands, rolled him on to his side, and removed the handgun. The process of removing the handgun did not wake Ries. Continued efforts to wake Ries were eventually successful. While identifying Ries, the officers learned that he was ineligible to possess a firearm. The State subsequently charged Ries with felon in possession of a firearm, Minn. Stat. § 609.165, subd. 1b(a) (2018).
Before trial, Ries moved to suppress the handgun, arguing the officers' conduct (grabbing his hands, rolling him on to his side, and removing the handgun) violated the Fourth Amendment because the officers lacked a reasonable articulable suspicion of criminal activity. By contrast, the State argued that "[t]he sole issue in this case" was whether the officers "lawfully conducted a limited search of [Ries's] person for a handgun before assisting [the 911 caller] in removing him from her residence." As part of its argument, the State asserted that "the police may lawfully seize a firearm, without a warrant but under emergency circumstances, after being called to a residence where the person who possessed the firearm is drunk and may pose a danger to others."
Applying the emergency-aid doctrine articulated in Brigham City v. Stuart , 547 U.S. 398, 403, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006), and later adopted in State v. Lemieux , 726 N.W.2d 783, 788 (Minn. 2007), the district court denied Ries's motion to suppress the handgun in an order filed in 2013. As part of its analysis, the district court concluded that "even upon finding [Ries] sleeping, the officers were reasonable in their beliefs that [Ries] may wake up at any moment, be quite startled, and possibly reach for the handgun creating a very dangerous situation." Following a jury trial, Ries was convicted of the charged offense and the district court imposed a 48-month prison sentence, which was a downward durational sentencing departure.
In August 2015, Ries filed a timely petition for postconviction relief, challenging the district court's denial of his motion to suppress the handgun. Ries argued the district court's reliance on the emergency-aid doctrine was misplaced because at trial, the 911 caller testified that she knew Ries was her brother's friend and that she called 911 because she was "uncomfortable" with a gun in the apartment. According to Ries, this trial testimony established that the situation was "more of an eviction than an emergency." In opposing the petition, the State made no attempt to defend the district court's reliance on the emergency-aid doctrine. Instead, the State argued that the postconviction court "need not reach the emergency justification for a full warrantless search" because the officers engaged in "a limited Terry pat-down for safety, justified by the undisputed information that the intoxicated petitioner *638 had a gun on his person and a baby was nearby."
Without addressing the district court's reliance on the emergency-aid doctrine, the postconviction court concluded that the actions of the officers were justified under yet another Fourth Amendment exception-the "community-caretaking function"-which it described as being "totally divorced from the detection, investigation or acquisition of evidence relating to violation of a criminal statute." According to the postconviction court, the officers were presented with "a community concern" when they encountered "an unconscious drunk man with a gun in someone else's house" and their "sweep" of Ries's person was objectively reasonable because "[t]he constitution [did] not require law enforcement to sit and wait for [Ries] to awaken." Based on the above-described analysis, the postconviction court rejected Ries's Fourth Amendment claim in a 2015 order.
In the court of appeals, Ries challenged the postconviction court's Fourth Amendment analysis, arguing that "[t]here is no 'community-caretaking function' exception to the warrant requirement that justifies warrantless searches of a person." In the alternative, he argued that the officers' conduct was not authorized under the emergency-aid doctrine because there was no imminent emergency.
The State asked the court of appeals to affirm the postconviction court's Fourth Amendment analysis for three reasons. First, it argued that although the cases discussing the community-caretaking function generally focus on the impoundment of improperly parked vehicles, courts have recognized that police have a right to act without a warrant to protect public safety, totally divorced from the detection or investigation of crime. In support of this proposition, the State cited Cady v. Dombrowski , 413 U.S. 433, 441, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973) and State v. Maddix , 348 Wis.2d 179, 831 N.W.2d 778, 782-89 (Ct. App. 2013). Second, the State said that Ries's arguments regarding the emergency-aid doctrine were unavailing because the postconviction court "did not rely upon the exigent-circumstances warrant exception in [its] postconviction decision." In other words, the State agreed that the emergency-aid exception was not before the postconviction court. Perhaps more importantly, the State argued that the emergency-aid exception was not before the court of appeals. Third, the State argued that the officers' conduct (grabbing Ries's hands, rolling him on to his side, and removing the handgun) was "a reasonable and justified Terry pat for safety."
Persuaded by the State's Terry argument, the court of appeals affirmed the postconviction court's order, without reaching the parties' arguments regarding the community-caretaking function and the emergency-aid doctrine. State v. Ries , 889 N.W.2d 308, 317 (Minn. App. 2016). As part of its analysis, the court said "the officers had reasonable suspicion that a startled Ries might commit a crime, and were warranted in the belief that their safety and the safety of others could be in danger." Id. (emphasis added).
We granted Ries's request for review on one issue: whether "the seizure and warrantless search of Ries's person for a gun [was] justified as a valid Terry protective frisk." In his brief to our court, Ries argued the court of appeals' analysis of the suppression issue was flawed because " Terry does not allow police to conduct a warrantless seizure and search based on a generalized assumption that a person in a given situation might commit a certain crime."
Having addressed the issue on which we granted review, Ries then discussed the analysis set forth in the postconviction *639 court's 2015 order. According to Ries, there is no community-caretaking function exception to the warrant requirement authorizing warrantless searches of a person, and therefore the postconviction court erred when it relied on this exception. In an apparent desire to leave no stone unturned, Ries also discussed the analysis set forth in the district court's 2013 order. According to Ries, the district court erred in 2013 when it relied on the emergency-aid doctrine because no one in the apartment faced imminent injury; instead the 911 caller was simply "uncomfortable" knowing there was a gun in the apartment.
In the State's brief to our court, it conceded that the court of appeals erred when it "conflated the Terry pat for safety based on suspicion of criminal activity, with the distinct police caretaking function performed in this case." It then focused its argument on the community-caretaking function, citing cases in which police took lawful action to prevent a future harm, including State v. Deneui , 775 N.W.2d 221, 239 (S.D. 2009) (extending the community-caretaking function beyond vehicles and explaining that it is akin to a health and safety check). At the end of its argument, the State emphasized that the community-caretaking function exception was "distinct from the emergency or exigent-circumstances exception in that it [did] not depend on an ongoing or imminent danger."
To be crystal clear, Ries's gratuitous discussion in his brief of the district court's analysis does not provide a basis for affirming or reversing the decision of the court of appeals because Ries appealed from the postconviction court's 2015 order, not the district court's 2013 order. In addition, neither the State nor Ries ever argued that we should affirm the decision of the court of appeals based on the emergency-aid doctrine. With the above-described facts in mind, I consider the majority's decision to affirm the court of appeals' decision based on the emergency-aid doctrine.
II.
According to the majority, its consideration of the emergency-aid doctrine is appropriate because the State raised the issue in the district court and "Ries-the party appealing the Fourth Amendment issue-raised the emergency-aid issue in his brief to our court."[1] Ante at 628 n.4. I disagree.
"[F]orfeiture refers to the failure to timely assert a right." Leiendecker v. Asian Women United of Minn. , 895 N.W.2d 623, 631 n.3 (Minn. 2017) (citation omitted). A party can forfeit appellate review of an issue at different stages of the proceedings. Appellate review of an issue can be forfeited when a party fails to raise the issue in the district court. State v. Ali , 895 N.W.2d 237, 246 (Minn. 2017) (holding that the defendant forfeited his equal protection argument when he failed to raise the claim in the district court), cert. denied --- U.S. ----, 138 S. Ct. 640 (2018). It can also be forfeited when the party fails to raise the issue in the court of appeals. State v. Myhre , 875 N.W.2d 799, 806 (Minn. 2016) (explaining that issues not raised in the court of appeals are usually *640 forfeited here). Similarly, appellate review can be forfeited when the issue is not raised in the petition for review. State v. Hunn , 911 N.W.2d 816, 821 (Minn. 2018) (holding that the defendant forfeited his statutory issue because it was not raised in his petition for review). Finally, a party can forfeit appellate review by filing a brief in this court that fails to argue an issue that was raised at an earlier stage of the proceedings. State v. Williams , 771 N.W.2d 514, 517 n.2 (Minn. 2009) (holding that although the issues in question were properly raised in the petition for review, the defendant forfeited appellate review of the issues when he failed to brief or argue the issues in our court); see also Staunton v. State , 784 N.W.2d 289, 296 n.8 (Minn. 2010) (same); Barnes v. State , 768 N.W.2d 359, 363 n.2 (Minn. 2009) (same); State v. Hurd , 763 N.W.2d 17, 32 (Minn. 2009) (same); Scruggs v. State , 484 N.W.2d 21, 24 n.1 (Minn. 1992) (same).[2]
Here, the State filed a brief with our court that conceded the court of appeals erred when it concluded the police action was justified under Terry v. Ohio , 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889. The State's brief then argued the police conduct was justified under the community-caretaking doctrine; an argument the court of appeals did not reach because it believed its Terry analysis was dispositive. As part of this argument, the State's brief emphasized that the legal issue the State was presenting to the court (whether the police conduct was justified under the community-caretaking doctrine) is "distinct from the emergency or exigent-circumstances exception in that it does not depend on an ongoing or imminent danger. " (Emphasis added.) Moreover, the State's brief did not cite Brigham City , 547 U.S. 398, 126 S.Ct. 1943, which established the emergency-aid exception, and the brief's single citation to Lemieux , 726 N.W.2d 783, was used to support a contention that the search of Ries "was not a full search for evidence requiring a full-search exception to the warrant requirement, nor was it a warrantless entry into a home, which would require a much higher level of exigency for justification."
Applying our well-established forfeiture law to this case, it is clear the State forfeited appellate review of the issue of whether we should affirm the decision of the court of appeals based on the emergency-aid doctrine by not arguing the issue in its brief. See Williams , 771 N.W.2d at 517 n.2 (holding that although the issues in question were properly raised in the petition for review, the defendant forfeited appellate review of the issues when he failed to brief or argue the issues in our court).
The majority does not squarely address the State's failure to argue that we should affirm the decision of the court of appeals based on the emergency-aid doctrine.[3] Instead, it asserts that the State raised the emergency-aid doctrine in the district court and that "Ries-the party appealing the Fourth Amendment issue-raised the emergency-aid issue in his brief to our court." Ante at 628 n.4. Even if these *641 assertions are true, they are irrelevant to the question before the court: Did the State subsequently forfeit appellate review of the issue in question when it failed to argue the issue in its brief to this court?
The majority's consideration of an issue that the State chose not to present to our court is no small matter. In our adversary system, "we follow the principle of party presentation." Greenlaw v. United States , 554 U.S. 237, 243, 128 S.Ct. 2559, 171 L.Ed.2d 399 (2008). Under this principle, "we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present ." Id. (emphasis added). In other words, "[c]ourts do not, or should not, sally forth each day looking for wrongs to right. We wait for cases to come to us, and when they do we normally decide only questions presented by the parties." Id. at 244, 128 S.Ct. 2559 (quoting United States v. Samuels , 808 F.2d 1298, 1301 (8th Cir. 1987) (Arnold, J., concurring) ). This is more than a prudential rule of convenience. As the Supreme Court has said, "[t]he premise of our adversarial system is that appellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them." NASA v. Nelson , 562 U.S. 134, 147 n.10, 131 S.Ct. 746, 178 L.Ed.2d 667 (2011) (citation omitted).
In explaining why appellate courts should avoid considering issues that were not presented by a party, scholars have suggested that "[t]he litigants' control of case presentation is thought to promote dignitary and participation values by 'affirm[ing] human individuality' and showing 'respect for the opinions of each party,' producing an outcome more satisfying to winners and losers alike." Amanda Frost, The Limits of Advocacy , 59 Duke L.J. 447, 459 (2009) (quoting Stephen Landsman, Readings on Adversarial Justice: The American Approach to Adjudication 33-39 (1988) ).
In my view, the majority places our status as a neutral arbiter at risk when it considers an issue the State chose not to present in its brief. This is especially true when we have repeatedly held that issues not briefed by criminal defendants were forfeited. See, e.g. , Staunton , 784 N.W.2d at 296 n.8 ; Williams , 771 N.W.2d at 517 n.2 ; Barnes , 768 N.W.2d at 363 n.2 ; Hurd , 763 N.W.2d at 32 ; Scruggs , 484 N.W.2d at 24 n.1. The risk to our status as a neutral arbiter is not ameliorated by the fact that Ries discussed the district court's 2013 order in his brief. In arguing that the district court erred when it relied on the emergency-aid doctrine, Ries did not confer on us a basis for affirming or reversing the decision of the court of appeals because Ries appealed from the postconviction court's 2015 order, not the district court's 2013 order. Disregarding the procedural posture of this case, the majority effectively affirms the district court's 2013 order (years after the time to appeal expired), concluding that such action is warranted because Ries questioned the validity of that order in the brief he filed with our court in this postconviction appeal. The lengths to which the majority is willing to go to reach an issue the State plainly abandoned is unnecessary and flatly inconsistent with our long-standing jurisprudence.
Instead of addressing an issue the State abandoned in its brief, I would follow our standard practice of remanding to the court of appeals to consider the alternative arguments that were raised, but not decided by the court of appeals. See State v. Dalbec , 800 N.W.2d 624, 629 (Minn. 2011) (remanding to the court of appeals for consideration of the arguments that were raised but not decided in the court of *642 appeals); see also Rochester City Lines Co. v. City of Rochester , 913 N.W.2d 443, 448 (Minn. 2018) (explaining that when alternative issues are raised but not decided in the court of appeals, "an appropriate disposition upon reversal by this court is to remand the case to the court of appeals to consider the alternative arguments"). Because our standard practice dictates a remand, we are not faced with a situation in which our duty to decide cases in accordance with the law requires us to overlook the State's failure to argue that we should affirm the decision of the court of appeals based on the emergency-aid doctrine. See State v. Hannuksela , 452 N.W.2d 668, 673 n.7 (Minn. 1990) (applying a legal doctrine that the parties failed to argue in their briefs or at oral argument because appellate courts have a responsibility to decide cases in accordance with the law). Instead, we can simply not decide the issue.
Even if we were in a situation that forced us to decide the issue, the appropriate action is not to sua sponte decide the issue. Instead, the appropriate action would be to solicit additional briefs because, as the majority's analysis makes abundantly clear, the law surrounding the emergency-aid doctrine is anything but unquestionable. See id. (suggesting that solicitation of additional briefing would have been appropriate if application of the doctrine had been "either novel or questionable").
For these reasons, I respectfully dissent from the majority's decision on the Fourth Amendment issue to affirm the decision of the court of appeals on alternative grounds.

Under the emergency-aid exception to the warrant requirement, a police officer may act "to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." State v. Lemieux , 726 N.W.2d 783, 787-88 (Minn. 2007) (quoting Brigham City v. Stuart , 547 U.S. 398, 403, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006) ).

Ries's postconviction petition did not include a request for an evidentiary hearing.

Ries also argues that he was seized when officers held his wrists immediately prior to and during the pat-frisk. The State argues that Ries was not seized because he was unconscious, and therefore was unable to evaluate whether he felt "free to leave." See In re Welfare of E.D.J. , 502 N.W.2d 779, 781-83 (Minn. 1993) (discussing the standard used to determine whether a person is seized under the Fourth Amendment and Article I, Section 10 of the Minnesota Constitution ). Because Ries was unquestionably searched when the officers patted him down, we are satisfied that the warrant requirement was triggered, and we need not decide whether Ries was also seized by the holding of his wrists or for other reasons.

Justice Hudson's concurrence/dissent states that our decision places "our status as a neutral arbiter at risk." We disagree. As stated in Justice Hudson's concurrence/dissent, the district court resolved the case on the basis of the emergency-aid exception so the State unquestionably raised this issue below. The record is developed sufficiently for us to resolve this question and the matter does not depend on disputed issues of fact. Moreover, Ries-the party appealing the Fourth Amendment issue-raised the emergency-aid issue in his brief to our court and the State has had an opportunity to respond to that argument. See, e.g. , State v. Myhre , 875 N.W.2d 799, 806 (Minn. 2016) (explaining that we may not reach an issue not raised in a petition for review or fully developed in the appellant's brief if those circumstances "inhibited the respondent's ability to argue the issue to our court"). Finally, the State contends that the search was valid. The fact that the State-the party that prevailed on the search issue below-did not pursue on appeal the emergency-aid exception as the basis for upholding the search does not preclude us from reaching the question. See, e.g. , Minn. R. Crim. P. 29.04, subd. 6 (allowing a respondent "to defend a decision or judgment on any ground that the law and record permit that would not expand the relief that has been granted to the party"). This is so because "it is the responsibility of appellate courts to decide cases in accordance with law, and that responsibility is not to be 'diluted by counsel's oversights, lack of research, failure to specify issues or cite relevant authorities.' " State v. Hannuksela , 452 N.W.2d 668, 673 n.7 (Minn. 1990) (addressing an issue that neither party raised in its briefing or at oral argument) (citation omitted).

Lemieux was not the tenant, but he had been staying at the home when the search occurred. Id. at 786.

We noted the prior application of an additional prong-that the search must not be primarily motivated by the intent to arrest and seize evidence-but recognized that the Court "rejected [that] prong, the subjective motivations of the officers," in Brigham City . Lemieux , 726 N.W.2d at 788 (discussing Brigham City , 547 U.S. at 404, 126 S.Ct. 1943 ).

We take this opportunity to clarify any confusion created by our reference to "a community-caretaking function" in Lemieux . See 726 N.W.2d at 787-88 ("[L]aw enforcement officers, in pursuing a community-caretaking function , 'may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury.' " (quoting Brigham City , 547 U.S. at 403, 126 S.Ct. 1943 ) (emphasis added) ). Lemieux is an emergency-aid case, not a community-caretaker case.

The State argues that this language in Martinez-Salazar is dicta. We disagree. Dicta generally refers to "expressions in a court's opinion which go beyond the facts before the court and therefore are the individual views of the author of the opinion." State ex rel. Foster v. Naftalin , 246 Minn. 181, 74 N.W.2d 249, 266 (1956). Statements and conclusions based on the facts and legal issues before the court, in contrast, are not dicta. See id. (explaining that a decision on "the precise question" presented, argued, and considered in an opinion is not dicta). In Martinez-Salazar , the Court squarely addressed the legal issue before it: whether the defendant had forfeited his right to challenge a for-cause ruling when he did not use a peremptory challenge.

In his brief to our court, Ries mentions the emergency-aid doctrine during a discussion of an issue that was not raised in his cross-petition for review: whether the district court erred when it relied on the emergency-aid doctrine. But, as the majority acknowledges, issues that are not raised in a request for review are forfeited. See In re GlaxoSmithKline PLC , 699 N.W.2d 749, 757 (Minn. 2005) ("Generally, we do not address issues that were not raised in a petition for review."). In my view, it is a bridge too far to rely on an issue that the postconviction court did not address and Ries forfeited to justify considering an issue the State abandoned in its brief to our court.

In State v. Beaulieu , 859 N.W.2d 275, 278 n.3 (Minn. 2015), we explicitly distinguished the concepts of "forfeiture" and "waiver." We noted that "forfeiture is the failure to make the timely assertion of a right," whereas "waiver is the intentional relinquishment or abandonment of a known right." Id . Our older cases, such as Staunton , Williams , Barnes , Hurd , and Scruggs , occasionally use "waiver" language while discussing issues or rights that parties have failed to timely assert. We have since clarified that such issues are better understood as "forfeiture" notwithstanding the "waiver" language.

To be clear, the State never argued-either in its brief or at oral argument-that we should affirm the decision of the court of appeals based on the emergency-aid doctrine.